## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ADVANCED MEDIA NETWORKS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> SPRINT CORPORATION, SPRINT COMMUNICATIONS, INC., BOOST WORLDWIDE, INC., VIRGIN MOBILE USA, INC., VIRGIN MOBILE USA, L.P., CLEARWIRE CORPORATION, AND CLEARWIRE COMMUNICATIONS, L.L.C. <br><br> Defendant. | Civil Action No. _____ <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Advanced Media Networks, LLC ("Advanced Media") files this Complaint for

patent infringement against Defendants Sprint Corporation, Sprint Communications, Inc., Boost

Worldwide, Inc., Virgin Mobile USA, Inc., Virgin Mobile USA, L.P., Clearwire Corporation,

and Clearwire Communications, L.L.C. (collectively, "Defendants"), and alleges as follows:

## PARTIES

1.      Plaintiff Advanced Media is a California limited liability company having a place

of business at 5900 Wilshire Boulevard, Suite 2600, Los Angeles, CA, 90036.

2.      Advanced Media (formerly NeTune Communications Inc.) is in the business of

designing and building advanced visual communications systems, integrated collaborative

systems, and converged networks and systems.  It was formed in the mid-1990's by the inventor

Curtis Clark and others for the express purpose of developing mobile systems that would enable

the streaming of video and other data from remote locations.  Advanced Media's development

efforts are reflected in the eleven (11) US and European patents, including the patent-in-suit, that

it owns and practices today. Advanced Media has worked closely with Hollywood Studios providing mobile WiFi networks on location for productions such as the Harry Potter series of motion pictures, Blackhawk Down, Spiderman, and numerous other motion picture and television productions, and continues to offer these services to the motion picture and other industries. Advanced Media has licensed the patent-in-suit to multiple mobile wireless network equipment and service providers for which Advanced Media is currently a global certified reseller of such equipment and services.

3.      Defendants Sprint Corporation and Sprint Communications, Inc. (collectively "Sprint") are corporations organized under the laws of the State of Delaware with a principal place of business at 6200 Sprint Parkway, Overland Park, KS 66251-4300. Sprint has a registered agent for service, Corporation Service Company, located at 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

4.      Defendant Boost Worldwide, Inc. ("Boost Mobile") is a wholly owned subsidiary of Sprint, organized under the laws of the State of Delaware, with a principal place of business at 9050 Irvine Center Drive, Irvine, CA 92618-4658. Boost Mobile has a registered agent for service, Corporation Service Company, located at 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

5.      Defendants Virgin Mobile USA, Inc. and Virgin Mobile USA, L.P. (collectively, "Virgin Mobile") are wholly owned subsidiaries of Sprint Corporation, organized under the laws of the State of Delaware, with a principal place of business at 10 Independence Blvd., #200, Warren, NJ 07059. Virgin Mobile has a registered agent for service, Corporation Service Company, located at 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

6.      Defendants Clearwire Corporation and Clearwire Communications, L.L.C.
(collectively, "Clearwire") are wholly owned subsidiaries of Sprint Corporation, each organized
under the laws of the State of Delaware, with a principal place of business at 4400 Carillon
Point, Kirkland, Washington 98033.  Clearwire has a registered agent for service, Corporation
Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

## JURISDICTION AND VENUE

7.      This civil action for patent infringement arises under the Patent Laws of the
United States, 35 U.S.C. §§ 1 *et* seq.  This Court has jurisdiction over the claims presented herein
pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.      On information and belief, Defendants Sprint, Boost Mobile, Virgin Mobile, and
Clearwire make, import, use, sell, and/or offer for sale the Accused Instrumentalities and
Services (as defined below) within the United States, including this District, that infringe one or
more claims of United States Patent No. 5,960,074, entitled "MOBILE TELE-COMPUTER
NETWORK FOR MOTION PICTURE, TELEVISION AND TV ADVERTISING
PRODUCTION" (the "'074 Patent" or "Asserted Patent").  The '074 Patent was duly and legally
issued by the United States Patent and Trademark Office on September 28, 1999.  A true and
correct copy of the '074 Patent is attached hereto as Exhibit 1.

9.      On May 11, 2010, a request for reexamination was filed.  On November 22, 2011,
a reexamination certificate was issued that, among other things, confirmed the patentability of
Claims 1, 10-14, 21-28, and 37-38.  Other claims were confirmed as amended, and new claims
were added.  A true and correct copy of the reexamination certificate is shown in Exhibit 1.

10.     On November 29, 2012 and February 6, 2013, two additional reexamination
requests were filed.  These requests were merged.  On April 23, 2014, a reexamination certificate

was issued that, among other things, confirmed the patentability of Claims 1-23, 28-37, 41-42,

44-63, 67-70, 72-73, 75-76, 91-99, 101-107, 123-124, and 126.   The patentability of other claims

was confirmed as amended, and new claims were added.   A true and correct copy of the

reexamination certificate is shown in Exhibit 1.

      11.    Sprint operates a nationwide digital wireless telecommunications system, and in

particular, operates the system to offer wireless services, including wireless broadband services,

to subscribers.   "At the end of the quarter, the Sprint platform served nearly 54 million

subscribers" and its "Sprint 4G LTE coverage [was] available to more than 225 million people."

Exhibit 2, Sprint Newsroom dated April 29, 2014, available at:

http://newsroom.sprint.com/news-releases/sprint-reports-results-for-the-quarter-ended-march-31-

2014.htm.   Sprint "provide[s] nationwide service through a combination of operating [its] own

network in both major and smaller U.S. metropolitan areas and rural connecting routes,

affiliations under commercial arrangements with third-party affiliates and roaming on other

providers' networks."   Exhibit 3, Form 10-K, Sprint Corporation, Transition Report for the

period from Jan. 1, 2014 to March 31, 2014, p. 4, available at:

http://www.sec.gov/Archives/edgar/data/101830/000010183014000030/sprintcorp201310-

kt.htm.

      12.    Sprint also "offer[s] wireless and wireline voice and data transmission services to

subscribers in all 50 states, Puerto Rico, and the U.S. Virgin Islands under the Sprint corporate

brand, which includes [their] retail brands of Sprint®, Boost Mobile®, Virgin Mobile®...on

networks that utilize third generation (3G) code division multiple access (CDMA) or Internet

protocol (IP) technologies."   Exhibit 3 at 2.   On July 9, 2013, Sprint acquired Clearwire, "which

provides [Sprint] with control of 2.5 gigahertz (GHz) spectrum and tower resources for use in

conjunction with our network modernization plan." Exhibit 3 at 2. Clearwire coverage is available nationwide, including in this District. *See, e.g.,* Exhibit 4, Clearwire coverage map of Wilmington, Delaware. Hence, Sprint and its subsidiaries, Boost Mobile Virgin Mobile, and Clearwire, market and sell their wireless services throughout the United States, including within this District.

13.     On information and belief, Sprint, Boost Mobile, Virgin Mobile, and Clearwire directly and/or indirectly import, manufacture, use, offer for sale, and/or sell the Accused Instrumentalities and Services (as defined below) within the United States, including this District, that infringe one or more claims of the `074 Patent.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1400(b) and 1391(c).

## GENERAL ALLEGATIONS

15.     Advanced Media is the owner by assignment of the Asserted Patent and is entitled to sue for past and future infringement thereof.

## SPRINT CORPORATION AND SPRINT COMMUNICATIONS, INC.

### Sprint's Accused Wireless Telecommunications Network

16.     Sprint is engaged in the business of selling digital wireless services to subscribers. Sprint operates a vast wireless telecommunications network over which subscribers are able to communicate voice data as well as other data using broadband services. Sprint's network consists of a large multitude of cells that communicate with mobile devices via microwaves. The cells typically provide redundant overlapping coverage for a given area such that a subscriber moving with a Sprint device from one area to the next may seamlessly be handed-off from one cell to the next without dropping service. *See, e.g.,* Newton's Telecom Dictionary, 16th Edition, p. 165 (16th Ed. 2000) (attached hereto as Exhibit 5) (under the definition of "Cell Switching").

Hence, the Sprint system (the "Sprint Accused System") constitutes a "redundant microwave communication system" as this phrase is used in claims of the `074 Patent.

### Sprint's Accused Consumer Devices

17.   A subscriber to Sprint's services over the Sprint Accused System typically buys or leases a digital communications device such as a smart phone, tablet computer ("tablet"), router, gateway, or other mobile device containing a WLAN network access point (i.e. "hotspot").

### Sprint's Accused Smart Phones

18.   Examples of smart phones currently imported, offered for sale, and/or sold by Sprint are the Apple iPhone 5, Apple iPhone 5c, Apple iPhone 5s, Apple iPhone 6, Apple iPhone 6 Plus, BlackBerry Bold 9930, BlackBerry Q10, HTC Desire 510, HTC One E8, HTC One (M8), HTC One M8 Harman/Kardon Edition, HTC One max, Kyocera Hydro Vibe, Kyocera Torque, LG G Flex, LG G2, LG G3, LG Optimus F3, Motorola Admiral, Samsung ATIV S Neo, Samsung Galaxy S III, Samsung Galaxy S 4, Samsung Galaxy S 5, Samsung Galaxy S 5 Sport, Samsung Galaxy Note 3, Samsung Galaxy Note 4, Sprint Vital, and all past, present and future cellular phones that offer connectivity to other devices to the Sprint network over a local area network provided by the device (these and all similar cellular phones referred to herein as the "Accused Phones").  Each of these Accused Phones may be configured to constitute a "mobile hub station configured to transfer information as a single nomadic transmission/reception point between the microwave communication system", *i.e.,* the Sprint telecommunications system, and a "wireless LAN [local area network] using an Ethernet packet switching protocol," "the TCP/IP protocol," and/or "an Internet protocol" (as terms are used in the claims, *e.g.,* Claims 1, 3, and

128, of the `074 Patent).  Whether or not a subscriber may utilize the mobile hotspot or tethering

feature of an Accused Phone is controlled by Sprint.

19.     For example, the Apple iPhone 6 provides a local area network to which another

device may connect the iPhone acting as a wireless hub to provide connectivity to the Sprint

telecommunications network when the "Personal Hotspot" is enabled.  *See* Exhibit 6, pp. 39 – 40

(under "Personal Hotspot": "Use Personal Hotspot to share your iPhone Internet connection.

Computers can share your Internet connection using Wi-Fi…").  The manual for the Apple

iPhone 6 notes "[The Personal Hotspot] feature may not be available with all carriers. Additional

fees may apply. Contact your carrier for more information."  *Id.* at p. 39.  Hence, Sprint controls

whether or not a user may utilize the Apple iPhone 6 as a mobile hotspot.

20.     As another example, the BlackBerry Q10 provides a local area network to which

another device may connect through the BlackBerry Q10 acting as a wireless hub to provide

connectivity to the Sprint telecommunications network when the "Mobile Hotspot" mode is

enabled.  *See* Exhibit 7, pp. 77 – 78 (under heading "Mobile Hotspot", "Use Mobile Hotspot to

Share Your Internet Connection.").  As noted in the manual for the BlackBerry Q10, the Mobile

Hotspot feature "uses the mobile network."  *Id.* at p. 78.  Hence, Sprint controls whether or not a

user may utilize the BlackBerry Q10 as a mobile hotspot.

21.     As another example, the HTC One M8 phone provides a local area network to

which another device may connect through the HTC One M8 acting as a wireless hub to provide

connectivity to the Sprint telecommunications network when the "Mobile Hotspot" is enabled.

*See* Exhibit 8, p. 25 (under "Sprint Hotspot": "Share your Sprint data connection with other Wi-

Fi capable devices using your HTC One (M8) as a mobile hotspot.").  As noted in the manual for

the HTC One M8, the "Mobile Hotspot" feature uses Sprint's data connection (i.e., cellular

network). *Id.* Hence, Sprint controls whether or not a user may utilize the HTC One M8 as a mobile hotspot.

22.     As another example, the Kyocera Hydro Vibe phone provides a local area network to which another device may connect through the Kyocera Hydro Vibe acting as a wireless hub to provide connectivity to the Sprint telecommunications network when the "Portable Wi-Fi Hotspot" mode is enabled. *See* Exhibit 9, pp. 106 – 108 ("Portable Wi-Fi Hotspot allows you to turn your phone into a Wi-Fi hotspot."). The "Portable Wi-Fi Hotspot" feature uses the phone's mobile data connection, hence Sprint controls whether or not a user may utilize the Kyocera Hydro Vibe as a mobile hotspot.

23.     As another example, the LG G Flex phone provides a local area network to which another device may connect through the LG G Flex acting as a wireless hub to provide connectivity to the Sprint telecommunications network when the "Wi-Fi Hotspot" is enabled. *See* Exhibit 10, pp. 172 – 173 (under "More Settings," under the subheading "Wi-Fi Hotspot"). As noted in the manual for the LG G Flex, the "Wi-Fi Hotspot" feature uses the phone's data connection. *Id.* at p. 172. Hence, Sprint controls whether or not a user may utilize the LG G Flex as a mobile hotspot.

24.     As another example, the Motorola Admiral phone provides a local area network to which another device may connect through the Motorola Moto Admiral acting as a wireless hub to provide connectivity to the Sprint telecommunications network when the "Wi-Fi Hotspot" mode is enabled. *See* Exhibit 11, p. 105 - 106 ("Wi-Fi Hotspot": "You can set up your phone as a Wi-Fi hotspot to provide portable, convenient internet access for up to 5 other Wi-Fi enabled devices."). As noted in the manual for the Motorola Admiral, "You need to subscribe to Wi-Fi

hotspot service to use this feature. Contact Sprint for details." *Id*. Hence, Sprint controls whether or not a user may utilize the Motorola Moto Admiral as a mobile hotspot.

25.     As another example, the Samsung Galaxy S 5 phone provides a local area network to which another device may connect through the Samsung Galaxy S 5 acting as a wireless hub to provide connectivity to the Sprint telecommunications network when the "Hotspot" feature is enabled. *See* Exhibit 12, p. 85 - 86 (under "Hotspot": "Use the Hotspot feature to share your phone's data connection with other devices via Wi-Fi."). As noted in the manual for the Samsung Galaxy S 5, "Use of the Hotspot feature requires an additional subscription. Sign on to your account at sprint.com/mysprint or access your account via Sprint Zone…to learn more." *Id*. Hence, Sprint controls whether or not a user may utilize the Samsung Galaxy S 5 as a mobile hotspot.

26.     As another example, the Sprint Vital phone provided a local area network to which another device could connect through the Sprint Vital acting as a wireless hub to provide connectivity to the Sprint telecommunications network when the "Wi-Fi Hotspot" mode was enabled. *See* Exhibit 13, p. 105 - 106 ("You can share your phone's data connection with several devices at once, by turning your phone into a portable Wi-Fi hotspot.). As noted in the Sprint Vital manual, "The [Wi-Fi Hotspot] feature needs data connection on a mobile network and may result in data charges." *Id*. Hence, Sprint controlled whether or not the user may utilize the Sprint Vital as a mobile hotspot.

## Sprint's Accused Tablets

27.     In addition to the Accused Phones, Sprint also offers for sale and sells the following tablet devices that have the capability to connect to the Sprint broadband wireless network as well as providing a local area network (LAN) over which other devices may connect

to the Sprint wireless network:  Apple iPad Air and Apple iPad Air 2, Apple iPad Mini, Apple

iPad Mini with Retina display, Samsung Galaxy Tab 3, Samsung Galaxy Tab 4, Samsung

Galaxy Tab S 10.5, Sprint Optik 2, and all past, present and future tablets that offer connectivity

to other devices to the Sprint network over a local area network provided by the device (these

and all similar mobile tablets referred to herein as the  "Accused Tablets").  Each of these

Accused Tablets may be configured to constitute a "mobile hub station configured to transfer

information as a single nomadic transmission/reception point between the microwave

communication system", *i.e.,* the Sprint telecommunications system, and a "wireless LAN [local

area network] using an Ethernet packet switching protocol," "the TCP/IP protocol," and/or "an

Internet protocol" (as terms are used in the claims, *e.g.* Claims 1, 3, and 128, of the `074 Patent).

### Sprint's Accused Mobile Access Points

28.     In addition to the Accused Phones and Accused Tablets, Sprint also offers for sale

and sells the base stations, including but not limited to the Sprint LivePro (*See* Exhibit 14), the

MiFi 500 LTE by Novatel Wireless (*See* Exhibit 15), the NETGEAR Zing Mobile Hotspot (*See*

Exhibit 16), and the Pocket Wi-Fi (*See* Exhibit 17), each of which connects to the Sprint wireless

network and provides a mobile local area network (LAN) through which other devices may

connect to the Sprint network.  All past, present and future mobile stations that offer connectivity

to other devices to the Sprint network over a local area network provided by the device are

referred to herein as the  "Accused Mobile Access Points."  The Accused Phones, Accused

Tablets, and Accused Mobile Access Points are collectively referred to herein as the "Accused

Devices."  Each of these Accused Mobile Access Points may be configured to constitute a

"mobile hub station configured to transfer information as a single nomadic

transmission/reception point between the microwave communication system", *i.e.,* the Sprint

telecommunications system, and a "wireless LAN [local area network] using an Ethernet packet switching protocol," "the TCP/IP protocol," and/or "an Internet protocol" (as terms are used in the claims, *e.g.*, Claims 1, 3, and 128, of the `074 Patent).

## Sprint Controls Access to its Telecommunications System

29.     A subscriber who purchases one of the Accused Devices must subscribe to a Sprint data plan to use the device to connect to the internet over Sprint's wireless network. In order for an Accused Device to be connected to Sprint's wireless system, the device must have a SIM card provided by Sprint that contains information that is associated with a subscriber's account and which enables the Accused Device to be used on Sprint's wireless network. Each Accused Device is enabled or activated by Sprint through information stored on a SIM card. In fact, a SIM card can be purchased by or reprogrammed for a subscriber to enable a device not purchased through Sprint to be used on Sprint's wireless network (any such phone, tablet or other device utilizing a Sprint SIM card providing a LAN for tethering or otherwise connecting other devices is also included within the definition of "Accused Devices"). The SIM card is the key by which Sprint controls which devices may connect to the Sprint wireless network. Without Sprint's SIM card, the Accused Device is useless for its intended purpose of facilitating wireless communications over a wireless network, although certain features such as a calculator or camera application may still be used. The code, data, and/or other information stored on the SIM card facilitates Sprint's control over which devices may be connected to the Sprint wireless communications network. The SIM card identifies the subscriber to Sprint's network and facilitates Sprint in billing the user for the services that the subscriber uses. In addition, in the event the subscriber's service or subscription is terminated, Sprint may de-activate the device via

the use of the code, data, and/or other information stored on the SIM card so that the device cannot connect to the Sprint telecommunications network.

30.     At least as to the Accused Phones and the Accused Tablets, the data plan typically, without additional fees, only allows the device itself to connect to the Sprint wireless network. In order to connect other devices through the LAN provided by one of the Accused Phones or the Accused Tablets, historically, a subscriber has paid an additional fee or subscribed to a more expensive and a higher capacity data plan for the ability to "tether" additional devices through the Accused Phone or Accused Tablet over the LAN provided by same. *See, e.g.,* Exhibit 12 at p. 85 ("Use of the Hotspot feature requires an additional subscription. Sign on to your account at sprint.com/mysprint or access your account via Sprint Zone…to learn more."). Sprint has typically charged a monthly fee of $10 for 1 gigabyte of data and $30 for 5 gigabytes of data for this additional "tethering" or hotspot capability. *See, e.g.,* Exhibit 18, *Hotspot: Share Your Phone's Mobile Data with Other Devices*, available at: http://techland.time.com/2014/02/04/hotspot-share-your-phones-mobile-data-with-other-devices/. More recently, while Sprint continues to offer plans with an extra monthly charge for "tethering," limited "tethering" or "mobile hotspot" usage appears to be included in some Sprint data plans where the monthly fee for the plan depends on the amount of data selected. *See, e.g.,* Exhibit 19, Sprint Data Plan Chart Summary, available at: http://shop.sprint.com/mysprint/shop/plan/plan_wall.jsp?tabId=pt_data_plans_tab&flow=AAL& planFamilyType=null. Even when an additional fee is not charged by Sprint for tethering and/or mobile hotspot service, the use of tethering and/or mobile hotspot service results in a higher amount of data downloaded by a subscriber which, in turn, results in higher fees to Sprint. Telecommunications services offered for sale and sold by Sprint in connection with the Accused

Devices, including but not limited to the "tethering" services, the "mobile hotspot" service, and the services sold in connection with data plans associated with the Accused Mobile Access Points are referred to herein as the "Accused Services."

31.     The Sprint Accused System and the Accused Devices are collectively referred to herein as the "Accused Instrumentalities." The Accused Instrumentalities and the Accused Services are collectively referred to herein as the "Accused Instrumentalities and Services."

### Sprint's Infringing Acts

32.     Sprint has directly infringed and continues to directly infringe one or more claims of the `074 Patent by making, having made, importing, using, offering for sale, and/or selling the Accused Instrumentalities and Services.

33.     For example, but not as a limitation, Sprint's direct infringement of Claims 1, 3, and 128 of the `074 Patent is shown in each of the claim charts of Exhibits 20-30.

34.     Sprint's network is a redundant microwave communication system.

35.     Each of the Accused Instrumentalities is capable of providing a wireless local area network.

36.     Each of the Accused Instrumentalities is capable of providing a mobile Wi-Fi Hotspot.

37.     Each of the Accused Instrumentalities is capable of acting as a mobile hub station.

38.     Each of the Accused Instrumentalities is capable of transferring information between Sprint's microwave communication system and a wireless LAN using an ethernet packet switching protocol.

39.     Each of the Accused Instrumentalities is capable of transferring information between Sprint's microwave communication system and a wireless LAN using the TCP/IP protocol.

40.     Each of the Accused Instrumentalities is capable of transferring information between Sprint's microwave communication system and a wireless LAN using an Internet protocol.

41.     Therefore, by way of example, but not as a limitation, Sprint has and continues to directly infringe Claims 1, 3, and 128 of the '074 Patent. In addition, Sprint has and continues to infringe other Claims of the '074 Patent.

42.     Furthermore, Sprint has engaged in indirect infringement since at least as early as November 6, 2012, the date it received actual notice (as set forth below), and continues to indirectly infringe one or more claims of the '074 Patent by providing its customers with the infringing Accused Instrumentalities and Services in order to enable those customers to use the Sprint Accused System in connection with one or more of the Accused Devices in a manner covered by one or more of the claims of the Asserted Patent. Sprint has and continues to actively promote tethering and/or local hotspot functionality to its subscribers knowing that the subscriber's utilization of such tethering or local hotspot functionality on one or more of the Accused Devices constitutes infringement of one or more claims of the Asserted Patent. Each subscriber that has tethering or local hotspot capability as part of his or her (or in the case of an entity, its) Sprint data plan or that pays an extra fee for tethering or local hotspot service in connection with an Accused Device directly infringes one or more claims of the Asserted Patent by his or her (or in the case of an entity, its) use of the Accused Instrumentalities in connection with tethering or local hotspot service.

## Sprint Received Actual Notice

43.     On or about November 6, 2012, Advanced Media sent a letter to Sprint, which letter was actually received by Sprint, a true and correct copy of which is attached hereto as Exhibit 31 (the "Letter").  By the Letter, AMN notified Sprint that its smartphones, dedicated mobile hotspot equipment, such as the Express Mobile Hotspot, and Sprint's mobile hotspot services infringed the '074 Patent.  Furthermore, the Letter provided Sprint notice that Advanced Media was in litigation with Gogo, Inc., which litigation was subsequently resolved in July, 2013, by a licensing agreement.  A copy of the '074 Patent and its prosecution history were provided to Sprint with the Letter.

44.     In spite of such actual knowledge of the '074 Patent, Sprint continued and continues to infringe one or more claims of the '074 Patent.

## BOOST WORLDWIDE, INC.

### Boost Mobile's Accused Wireless Telecommunications Network

45.     Boost Mobile is engaged in the business of selling digital wireless services to subscribers.  Boost Mobile "offers service on the Nationwide Sprint Network."  *See* Exhibit 32, Boost Mobile Coverage Map, available at:  http://www.boostmobile.com/coverage/.  Using Sprint's Network, Boost Mobile offers a vast wireless telecommunications network over which subscribers are able to communicate voice data as well as other data using broadband services. Boost Mobile's Network consists of a large multitude of cells that communicate with mobile devices via microwaves.  The cells typically provide redundant overlapping coverage for a given area such that a subscriber moving with a Boost Mobile device from one area to the next may seamlessly be handed-off from one cell to the next without dropping service.  *See, e.g.*, Newton's Telecom Dictionary, 16th Edition, p. 165 (16th Ed.  2000) (attached hereto as Exhibit 5, the

definition of "Cell Switching"). Hence, the system used by Boost Mobile (the "Boost Accused System") constitutes a "redundant microwave communication system" as this phrase is used in claims of the '074 Patent.

### Boost Mobile's Accused Consumer Devices

46.     A subscriber to Boost Mobile's services over the Boost Accused System typically buys or leases a digital communications device such as a smart phone, tablet computer ("tablet"), router, gateway, or other mobile device containing a WLAN network access point (i.e. "hotspot").

### Boost Mobile's Accused Smart Phones

47.     Examples of smart phones currently imported, offered for sale, and/or sold by Boost Mobile are the Apple iPhone 4s, Apple iPhone 5c, Apple iPhone 5s, Apple iPhone 6, Apple iPhone 6 Plus, LG Optimus F3, LG Optimus F7, LG Realm, LG Volt, Motorola Moto G, Samsung Galaxy Rush, Samsung Galaxy S III, Samsung Galaxy S 5, ZTE Warp Sync, and all past, present and future cellular phones that offer connectivity to other devices to the Boost Mobile network over a local area network provided by the device (these and all similar cellular phones referred to herein as the "Accused Phones"). Each of these Accused Phones may be configured to constitute a "mobile hub station configured to transfer information as a single nomadic transmission/reception point between the microwave communication system", *i.e.,* the telecommunications system used by Boost Mobile, and a "wireless LAN [local area network] using an Ethernet packet switching protocol," "the TCP/IP protocol," and/or "an Internet protocol" (as terms are used in the claims, *e.g.*, Claims 1, 3, and 128, of the '074 Patent). Whether or not a subscriber may utilize the mobile hotspot or tethering feature of an Accused Phone is controlled by Boost Mobile.

48. For example, the Apple iPhone 5s provides a local area network to which another device may connect the iPhone acting as a wireless hub to provide connectivity to the telecommunications network used by Boost Mobile when the "Personal Hotspot" is enabled. *See* Exhibit 33, pp. 39 – 40 (under "Personal Hotspot": "Use Personal Hotspot to share your iPhone Internet connection. Computers can share your Internet connection using Wi-Fi...."). The manual for the Apple iPhone 5s notes "[The Personal Hotspot] feature may not be available with all carriers. Additional fees may apply. Contact your carrier for more information." *Id.* at p. 39. Hence, Boost Mobile controls whether or not a user may utilize the Apple iPhone 5s as a mobile hotspot.

49. As another example, the LG Realm phone provides a local area network to which another device may connect through the LG Realm acting as a wireless hub to provide connectivity to the telecommunications network used by Boost Mobile when the "Wi-Fi Hotspot" is enabled. *See* Exhibit 34, p. 131 ("Wi-Fi Hotspot": "You can share your phone's data connection with up to five devices at once, by turning your phone into a portable Wi-Fi hotspot."). As noted in the manual for the LG Realm, "[The Wi-Fi Hotspot] service is available for a daily rate. Visit boostmobile.com for more details." *Id.* Hence, Boost Mobile controls whether or not a user may utilize the LG Realm as a mobile hotspot.

50. As another example, the Motorola Moto G phone provides a local area network to which another device may connect through the Motorola Moto G acting as a wireless hub to provide connectivity to the telecommunications network used by Boost Mobile when the "Wi-Fi Hotspot" mode is enabled. *See* Exhibit 35, pp. 62 – 63 ("Wi-Fi Hotspot": "You can set up your phone as a Wi-Fi hotspot to provide portable, convenient internet access for up to eight other Wi-Fi enabled devices."). As noted in the manual for the Motorola Moto G, "You need to subscribe

to Wi-Fi hotspot service to use this feature. Contact Boost for details." *Id.* at p. 62.  Hence, Boost Mobile controls whether or not a user may utilize the Motorola Moto X as a mobile hotspot.

51.     As another example, the Samsung Galaxy S 5 phone provides a local area network to which another device may connect through the Samsung Galaxy S 5 acting as a wireless hub to provide connectivity to the telecommunications network used by Boost Mobile when the "Hotspot" feature is enabled.  *See* Exhibit 36 ("You can use your device as an Internet AP (Access Point) using Hotspot. This allows other devices (maximum 10) to connect to it via Wi-Fi network.").  Hence, Boost Mobile controls whether or not a user may utilize the Samsung Galaxy S 5 as a mobile hotspot.

52.     As another example, the ZTE Warp Sync phone provides a local area network to which another device may connect through the ZTE Warp Sync acting as a wireless hub to provide connectivity to the telecommunications network used by Boost Mobile when the "Mobile Hotspot" mode is enabled.  *See* Exhibit 37, p. 100 - 102 ("Mobile Hotspot allows you to turn your phone into a Wi-Fi hotspot. When this feature is turned on, you can share your phone's mobile data services via Wi-Fi with other Wi-Fi enabled devices.").  As noted in the ZTE Warp Sync, "Use of the Hotspot feature may require an additional subscription. Visit boostmobile.com or access your account via Boost Zone…to learn more." *Id.* at p. 101.  Hence, Boost Mobile controls whether or not the user may utilize the ZTE Warp Sync as a mobile hotspot.

### Boost Mobile Controls Access to its Telecommunications System

53.     A subscriber who purchases one of the Accused Devices must subscribe to a Boost Mobile data plan to use the device to connect to the internet over a wireless network used by Boost Mobile.  In order for an Accused Device to be connected to the wireless system used by

Boost Mobile, the device must have a SIM card provided by Boost Mobile that contains information that is associated with a subscriber's account and which enables the Accused Device to be used on the wireless network used by Boost Mobile. Each Accused Device is enabled or activated by Boost Mobile through information stored on a SIM card. In fact, a SIM card can be purchased by or reprogrammed for a subscriber to enable a device not purchased through Boost Mobile to be used on the wireless network used by Boost Mobile (any such phone, tablet or other device utilizing a Boost Mobile SIM card providing a LAN for tethering or otherwise connecting other devices is also included within the definition of "Accused Devices"). The SIM card is the key by which Boost Mobile controls which devices may connect to the wireless network used by Boost Mobile. Without Boost Mobile's SIM card, the Accused Device is useless for its intended purpose of facilitating wireless communications over a wireless network, although certain features such as a calculator or camera application may still be used. The code, data, and/or other information stored on the SIM card facilitate Boost Mobile's control over which devices may be connected to the wireless communications network used by Boost Mobile. The SIM card identifies the subscriber to Boost Mobile's network and facilitates Boost Mobile in billing the user for the services that the subscriber uses. In addition, in the event the subscriber's service or subscription is terminated, Boost Mobile may de-activate the device via the use of the code, data, and/or other information stored on the SIM card so that the device cannot connect to the telecommunications network used by Boost Mobile.

54.     At least as to the Accused Phones and the Accused Tablets, the data plan typically, without additional fees, only allows the device itself to connect to the wireless network used by Boost Mobile. In order to connect other devices through the LAN provided by one of the Accused Phones or the Accused Tablets, historically, a subscriber has paid an additional fee

or subscribed to a more expensive and a higher capacity data plan for the ability to "tether" additional devices through the Accused Phone or Accused Tablet over the LAN provided by same. *See, e.g.*, Exhibit 35, p. 62 ("You need to subscribe to Wi-Fi hotspot service to use this feature. Contact Boost for details."). More recently, Boost Mobile charges $5 dollars a day for daily mobile hotspot access if a customer is on a "Monthly Unlimited Plan." Exhibit 38, ("Wi-Fi for only $5/day"), available at http://www.boostmobile.com/shop/plans/mobile-hotspot/. Even when an additional fee is not charged by Boost Mobile for tethering and/or mobile hotspot service, the use of tethering and/or mobile hotspot service results in a higher amount of data downloaded by a subscriber, which in turn results in higher fees to Boost Mobile.

55.     Telecommunications services offered for sale and sold by Boost Mobile in connection with the Accused Devices, including but not limited to the "Tethering" services, the "mobile hotspot" service, and the services sold in connection with data plans associated with the Accused Mobile Access Points are referred to herein as the "Accused Services." The Boost Accused System and the Accused Devices are collectively referred to herein as the "Accused Instrumentalities." The Accused Instrumentalities and the Accused Services are collectively referred to herein as the "Accused Instrumentalities and Services."

<u>**Boost Mobile's Infringing Acts**</u>

56.     Boost Mobile has directly infringed and continues to directly infringe one or more claims of the `074 Patent by making, having made, importing, using, offering for sale, and/or selling the Accused Instrumentalities and Services.

57.     Boost Mobile uses Sprint's network, which is a redundant microwave communication system.

58.     Each of the Accused Instrumentalities is capable of providing a wireless local area network.

59.     Each of the Accused Instrumentalities is capable of providing a mobile Wi-Fi Hotspot.

60.     Each of the Accused Instrumentalities is capable of acting as a mobile hub station.

61.     Each of the Accused Instrumentalities is capable of transferring information between Sprint's microwave communication system and a wireless LAN using an ethernet packet switching protocol.

62.     Each of the Accused Instrumentalities is capable of transferring information between Sprint's microwave communication system and a wireless LAN using the TCP/IP protocol.

63.     Each of the Accused Instrumentalities is capable of transferring information between Sprint's microwave communication system and a wireless LAN using an Internet protocol.

64.     Therefore, by way of example, but not as a limitation, Boost Mobile has and continues to directly infringe Claims 1, 3, and 128 of the `074 Patent.  In addition, Boost Mobile has and continues to infringe other Claims of the `074 Patent.

65.     For example, but not as a limitation, Boost Mobile's direct infringement of Claims 1, 3, and 128 of the `074 Patent is shown in each of the claim charts of Exhibits 39-43.

66.     Furthermore, Boost Mobile has engaged in indirect infringement, with knowledge of the Asserted Patent, since at least as early as service of the present suit and continues to indirectly infringe one or more claims of the `074 Patent by providing its customers with the infringing Accused Instrumentalities and Services in order to enable those customers to use the

Boost Accused System in connection with one or more of the Accused Devices in a manner covered by one or more of the claims of the Asserted Patent. Boost Mobile has and continues to actively promote tethering and/or local hotspot functionality to its subscribers knowing that the subscriber's utilization of such tethering or local hotspot functionality on one or more of the Accused Devices constitutes infringement of one or more claims of the Asserted Patent. Each subscriber that has tethering or local hotspot capability as part of his or her (or in the case of an entity, its) Boost Mobile data plan or that pays an extra fee for tethering or local hotspot service in connection with an Accused Device directly infringes one or more claims of the Asserted Patent by his or her (or in the case of an entity, its) use of the Accused Instrumentalities in connection with tethering or local hotspot service.

## VIRGIN MOBILE USA, INC. AND VIRGIN MOBILE USA, L.P.

### Virgin Mobile's Accused Wireless Telecommunications Network

67.     Virgin Mobile is engaged in the business of selling digital wireless services to subscribers. Virgin Mobile "is powered by the Sprint Network." *See* Exhibit 44, Virgin Mobile Coverage Map, available at: http://www.virginmobileusa.com/check-cell-phone-coverage. Using Sprint's Network, Virgin Mobile operates a vast wireless telecommunications network over which subscribers are able to communicate voice data as well as other data using broadband services. Virgin Mobile's network consists of a large multitude of cells that communicate with mobile devices via microwaves. The cells typically provide redundant overlapping coverage for a given area such that a subscriber moving with a Virgin Mobile device from one area to the next may seamlessly be handed-off from one cell to the next without dropping service. *See, e.g.,* Newton's Telecom Dictionary, 16th Edition, p. 165 (16th Ed. 2000) (attached hereto as Exhibit 5, the definition of "Cell Switching"). Hence, the system used by Virgin Mobile (the

"Virgin Accused System") constitutes a "redundant microwave communication system" as this

phrase is used in claims of the `074 Patent.

### Virgin Mobile's Accused Consumer Devices

68.     A subscriber to Virgin Mobile's services over the Virgin Accused System

typically buys or leases a digital communications device such as a smart phone, tablet computer

("tablet"), router, gateway, or other mobile device containing a WLAN network access point

(i.e. "hotspot").

### Virgin Mobile's Accused Smart Phones

69.     Examples of smart phones currently imported, offered for sale, and/or sold by

Virgin Mobile are the Apple iPhone 4, Apple iPhone 4s, Apple iPhone 5c, Apple iPhone 5s,

Apple iPhone 6, Apple iPhone 6 Plus, HTC Desire, HTC Desire 816, Kyocera Event, Kyocera

Hydro Vibe 4G LTE, LG Optimus F3, LG Volt, Samsung Galaxy S III, Samsung Galaxy S 5,

Samsung Galaxy Victory, and all past, present and future cellular phones that offer connectivity

to other devices to the network used by Virgin Mobile over a local area network provided by the

device (these and all similar cellular phones referred to herein as the "Accused Phones"). Each

of these Accused Phones may be configured to constitute a "mobile hub station configured to

transfer information as a single nomadic transmission/reception point between the microwave

communication system", *i.e.,* the telecommunications system used by Virgin Mobile, and a

"wireless LAN [local area network] using an Ethernet packet switching protocol," "the TCP/IP

protocol," and/or "an Internet protocol" (as terms are used in the claims, *e.g.,* Claims 1, 3, and

128, of the `074 Patent). Whether or not a subscriber may utilize the mobile hotspot or tethering

feature of an Accused Phone is controlled by Virgin Mobile.

70.     For example, the Apple iPhone 4s provides a local area network to which another device may connect the iPhone acting as a wireless hub to provide connectivity to the telecommunications network used by Virgin Mobile when the "Personal Hotspot" is enabled. *See* Exhibit 45, pp. 39 – 40 (under "Personal Hotspot": "Use Personal Hotspot to share your iPhone Internet connection. Computers can share your Internet connection using Wi-Fi...."). The manual for the Apple iPhone 4s notes "[The Personal Hotspot] feature may not be available with all carriers. Additional fees may apply. Contact your carrier for more information." *Id.* at p. 39. Hence, Virgin Mobile controls whether or not a user may utilize the Apple iPhone 4s as a mobile hotspot.

71.     As another example, the HTC Desire 816 phone provides a local area network to which another device may connect through the HTC Desire 816 acting as a wireless hub to provide connectivity to the Virgin telecommunications network when the "Mobile Hotspot" is enabled. *See* Exhibit 46, p. 129 (under "Mobile Hotspot": "You can share your phone's data connection with up to five devices at once, by turning your phone into a portable Wi-Fi hotspot."). As noted in the manual for the HTC Desire 816, "[The Mobile Hotspot] service is available for a daily rate. Visit virginmobileusa.com for more details." *Id.* Hence, Virgin controls whether or not a user may utilize the HTC Desire 816 as a mobile hotspot.

72.     As another example, the Kyocera Hydro Vibe phone provides a local area network to which another device may connect through the Kyocera Hydro Vibe acting as a wireless hub to provide connectivity to the Virgin telecommunications network when the "Portable Wi-Fi Hotspot" mode is enabled. *See* Exhibit 47, pp. 104 - 106 ("Portable Wi-Fi Hotspot allows you to turn your phone into a Wi-Fi hotspot."). The "Portable Wi-Fi Hotspot"

feature uses the phone's mobile data connection, hence Virgin controls whether or not a user may utilize the Kyocera Hydro Vibe as a mobile hotspot.

73.     As another example, the LG Optimus F3 phone provides a local area network to which another device may connect through the LG Optimus F3 acting as a wireless hub to provide connectivity to the Virgin telecommunications network when the "Daily Mobile Hotspot" is enabled. *See* Exhibit 48, p. 1 (under "Top Features" under the subheading "Daily Mobile Hotspot"). The "Daily Mobile Hotspot" feature allows "up to 5 Wi-Fi enabled devices" to use the phone's data connection for an additional $5 a day. *Id.* Hence, Virgin controls whether or not a user may utilize the LG Optimus F3 as a mobile hotspot.

74.     As another example, the Samsung Galaxy S 5 phone provides a local area network to which another device may connect through the Samsung Galaxy S 5 acting as a wireless hub to provide connectivity to the Virgin telecommunications network when the "Daily Mobile Hotspot" is enabled. *See* Exhibit 49, p. 1 (under "Top Features" under the subheading "Daily Mobile Hotspot"). The "Daily Mobile Hotspot" feature allows "up to 5 Wi-Fi enabled devices" to use the phone's data connection for an additional $5 a day. *Id.* Hence, Virgin controls whether or not a user may utilize the Samsung Galaxy S 5 as a mobile hotspot.

### Virgin Mobile's Accused Mobile Access Points

75.     In addition to the Accused Phones, Virgin Mobile also offers for sale and sells the base stations intended for home use, including but not limited to the NetGear Mingle Mobile Hotspot (*See* Exhibit 50) and the OverDrive Pro 3G/4G Mobile Hotspot (*See* Exhibit 51), each of which connects to the wireless network used by Virgin Mobile and provides a local area network (LAN) through which other devices may connect to the Virgin Mobile network. All past, present and future base stations that offer connectivity to other devices to the Virgin Mobile network

over a local area network provided by the device are referred to herein as the "Accused Mobile Access Points." The Accused Phones, Accused Tablets, and Accused Mobile Access Points are collectively referred to herein as the "Accused Devices." Each of these Accused Mobile Access Points may be configured to constitute a "mobile hub station configured to transfer information as a single nomadic transmission/reception point between the microwave communication system," *i.e.,* the telecommunications system used by Virgin Mobile, and a "wireless LAN [local area network] using an Ethernet packet switching protocol," "the TCP/IP protocol," and/or "an Internet protocol" (as terms are used in the claims, *e.g.,* Claims 1, 3, and 128, of the `074 Patent).

## Virgin Mobile Controls Access to its Telecommunications System

76.    A subscriber who purchases one of the Accused Devices must subscribe to a Virgin Mobile data plan to use the device to connect to the Internet over a wireless network used by Virgin Mobile. In order for an Accused Device to be connected to the wireless system used by Virgin Mobile, the device must have a SIM card provided by Virgin Mobile that contains information that is associated with a subscriber's account and which enables the Accused Device to be used on the wireless network used by Virgin Mobile. Each Accused Device is enabled or activated by Virgin Mobile through information stored on a SIM card. In fact, a SIM card can be purchased by or reprogrammed for a subscriber to enable a device not purchased through Virgin Mobile to be used on the wireless network used by Virgin Mobile (any such phone, tablet or other device utilizing a Virgin Mobile SIM card providing a LAN for tethering or otherwise connecting other devices is also included within the definition of "Accused Devices"). The SIM card is the key by which Virgin Mobile controls which devices may connect to the wireless network used by Virgin Mobile. Without Virgin Mobile's SIM card, the Accused Device is useless for its intended purpose of facilitating wireless communications over a wireless network,

although certain features such as a calculator or camera application may still be used. The code, data, and/or other information stored on the SIM card facilitates Virgin Mobile's control over which devices may be connected to the wireless communications network used by Virgin Mobile. The SIM card identifies the subscriber to Virgin Mobile's network and facilitates Virgin Mobile in billing the user for the services that the subscriber uses. In addition, in the event the subscriber's service or subscription is terminated, Virgin Mobile may de-activate the device via the use of the code, data, and/or other information stored on the SIM card so that the device cannot connect to the telecommunications network used by Virgin Mobile.

77.     At least as to the Accused Phones and the Accused Tablets, the data plan typically, without additional fees, only allows the device itself to connect to the wireless network used by Virgin Mobile. In order to connect other devices through the LAN provided by one of the Accused Phones or the Accused Tablets, historically, a subscriber has paid an additional fee or subscribed to a more expensive and a higher capacity data plan for the ability to "tether" additional devices through the Accused Phone or Accused Tablet over the LAN provided by same. *See, e.g.*, Exhibit 46, p. 129 ("You can share your phone's data connection with up to five devices at once, by turning your phone into a portable Wi-Fi hotspot. This service is available for a daily rate. Visit virginmobileusa.com for more details."). More recently, Virgin Mobile charges a data fee depending on the customer's usage. For example, under its "Broadband2GO Plans" it charges $5 a day for 250 MB of data, $25 a month for 1.5 GB of data, and $55 a month for 6 GB of data. Exhibit 52, "Broadband2Go Plans," available at: http://www.virginmobileusa.com/mobile-broadband-plans/broadband-2-go/overview/. These plans are made for its Mobile Access Point devices, the Netgear Mingle Mobile Hotspot and the Overdrive Pro 3G/4G Mobile Hotspot, recently selling for $79.99 (down from $99.99) and

$71.99 (down from $119.99), respectively. *Id.* Virgin Mobile's unlimited data and messaging plans "turn your smartphone into a mobile hotspot for a day" for a fee of $5. Exhibit 53, "Beyond Talk," available at: http://www.virginmobileusa.com/cell-phone-plans/beyond-talk-plans/overview/. Even when an additional fee is not charged by Virgin Mobile for tethering and/or mobile hotspot service, the use of tethering and/or mobile hotspot service results in a higher amount of data downloaded by a subscriber, which in turn results in higher fees to Virgin Mobile. Telecommunications services offered for sale and sold by Virgin Mobile in connection with the Accused Devices, including but not limited to the "Tethering" services, the "mobile hotspot" service, and the services sold in connection with data plans associated with the Accused Mobile Access Points are referred to herein as the "Virgin Accused Services."

78.     The Virgin Accused System and the Accused Devices are collectively referred to herein as the "Accused Instrumentalities." The Accused Instrumentalities and the Virgin Accused Services are collectively referred to herein as the "Accused Instrumentalities and Services."

## Virgin Mobile's Infringing Acts

79.     Virgin Mobile has directly infringed and continues to directly infringe one or more claims of the `074 Patent by making, having made, importing, using, offering for sale, and/or selling the Accused Instrumentalities and Services.

80.     For example, but not as a limitation, Virgin Mobile's direct infringement of Claims 1, 3, and 128 of the `074 Patent is shown in each of the claim charts of Exhibits 54-59.

81.     Virgin Mobile uses Sprint's network, which is a redundant microwave communication system.

82.     Each of the Accused Instrumentalities is capable of providing a wireless local area network.

83.     Each of the Accused Instrumentalities is capable of providing a mobile Wi-Fi Hotspot.

84.     Each of the Accused Instrumentalities is capable of acting as a mobile hub station.

85.     Each of the Accused Instrumentalities is capable of transferring information between Sprint's microwave communication system and a wireless LAN using an ethernet packet switching protocol.

86.     Each of the Accused Instrumentalities is capable of transferring information between Sprint's microwave communication system and a wireless LAN using the TCP/IP protocol.

87.     Each of the Accused Instrumentalities is capable of transferring information between Sprint's microwave communication system and a wireless LAN using an Internet protocol.

88.     Therefore, by way of example, but not as a limitation, Virgin Mobile has and continues to directly infringe Claims 1, 3, and 128 of the `074 Patent.  In addition, Virgin Mobile has and continues to infringe other Claims of the `074 Patent.

89.     Furthermore, Virgin Mobile has engaged in indirect infringement, with knowledge of the Asserted Patent, since at least as early as service of the present suit and continues to indirectly infringe one or more claims of the `074 Patent by providing its customers with the infringing Accused Instrumentalities and Services in order to enable those customers to use the Virgin Accused System in connection with one or more of the Accused Devices in a manner covered by one or more of the claims of the Asserted Patent.  Virgin Mobile has and

continues to actively promote tethering and/or local hotspot functionality to its subscribers

knowing that the subscriber's utilization of such tethering or local hotspot functionality on one or

more of the Accused Devices constitutes infringement of one or more claims of the Asserted

Patent. Each subscriber that has tethering or local hotspot capability as part of his or her (or in

the case of an entity, its) Virgin Mobile data plan or that pays an extra fee for tethering or local

hotspot service in connection with an Accused Device directly infringes one or more claims of

the Asserted Patent by his or her (or in the case of an entity, its) use of the Accused

Instrumentalities in connection with tethering or local hotspot service.

## CLEARWIRE CORPORATION AND CLEARWIRE COMMUNICATIONS, L.L.C.

### Clearwire's Accused Wireless Telecommunications Network

90.     Clearwire is engaged in the business of selling digital wireless services to

subscribers. Clearwire "has joined Sprint." *See, e.g.*, Exhibit 60, Clearwire Coverage Map,

available at: https://www.clear.com/coverage; Exhibit 61, Clearwire Coverage Map, available at:

http://coverage.sprint.com/IMPACT.jsp?INTNAV=ATG:HE:Cov. Using Sprint's Network,

Clearwire operates a vast wireless telecommunications network over which subscribers are able

to communicate voice data as well as other data using broadband services. The network used by

Clearwire consists of a large multitude of cells that communicate with mobile devices via

microwaves. The cells typically provide redundant overlapping coverage for a given area such

that a subscriber moving with a Clearwire device from one area to the next may seamlessly be

handed-off from one cell to the next without dropping service. *See, e.g.*, Newton's Telecom

Dictionary, 16th Edition, p. 165 (16th Ed. 2000) (attached hereto as Exhibit 5, the definition of

"Cell Switching"). Hence, the system used by Clearwire (the "Clearwire Accused System")

constitutes a "redundant microwave communication system" as this phrase is used in claims of the '074 Patent.

### Clearwire's Accused Consumer Devices

91.     A subscriber to Clearwire's services over the Clearwire Accused System typically buys or leases a digital communications device such as a mobile device containing a WLAN network access point (i.e. "hotspot").

### Clearwire's Accused Mobile Access Points

92.     Clearwire offered for sale and sold base stations intended for home use, including but not limited to the 4G+ Personal Hotspot, CLEAR Spot, CLEAR Spot 4G, CLEAR Spot Apollo, CLEAR Spot Voyager, CLEAR Spot Voyager Blue Limited Edition, CLEAR Spot Voyager Red Limited Edition, CradlePoint PHS2000W, iSpot and the Rover Puck by CLEAR, each of which connects to the wireless network used by Clearwire and provides a local area network (LAN) through which other devices may connect to the network used by Clearwire.  All past and present base stations that offer connectivity to other devices to the network used by Clearwire over a local area network provided by the device are referred to herein as the "Accused Devices."  Each of these Accused Devices may be configured to constitute a "mobile hub station configured to transfer information as a single nomadic transmission/reception point between the microwave communication system," *i.e.,* the telecommunications system used by Clearwire, and a "wireless LAN [local area network] using an Ethernet packet switching protocol," "the TCP/IP protocol," and/or "an Internet protocol" (as terms are used in the claims, *e.g.,* Claims 1, 3, and 128, of the '074 Patent).

93.     For example, the CLEAR Spot 4G provides a local area network to which another device may connect the CLEAR Spot 4G acting as a wireless hub to provide connectivity to the

telecommunications network used by Clearwire. *See* Exhibit 62, p. 7 (under "Share your CLEAR Spot": "It's easy to share your CLEAR Spot with up to eight devices at the same time."). The user guide for the CLEAR Spot 4G notes the device "search[es] for the CLEAR 4G network" and "connect[s] to the CLEAR 4G network." *Id.* at p. 5 (under "Turn the CLEAR Spot On" heading). Hence, Clearwire controls whether or not a user may utilize the CLEAR Spot 4G as a mobile hotspot.

94.     In another example, the CradlePoint PHS2000W provides a local area network to which another device may connect the CradlePoint PHS2000W acting as a wireless hub to provide connectivity to the telecommunications network used by Clearwire. *See* Exhibit 63, p. 1 (under "Business-Grade 4G Travel Router & Dock": "The PHS2000W handheld router supports up to 16 simultaneous WiFi connections – allowing you to connect laptops, game systems, printers, cameras, etc."). The CradlePoint PHS2000W connects to 4G networks, and the specification sheet for the CradlePoint PHS2000W notes the device "specifically optimized for enhanced performance and reliability when used within the Clearwire/Sprint WiMAX network." *Id.* at p. 1 (under "Enhanced Performance & Reliability"); *see also* p. 2 ("The CradlePoint 2000W creates a portable WiFi hotspot, so you can share your super-fast 4G WiMax broadband data service securely with all your WiFi … devices."). Clearwire controls access to its network. Hence, Clearwire controls whether or not a user may utilize the CradlePoint PHS2000W as a mobile hotspot.

### Clearwire Controls Access to its Telecommunications System

95.     A subscriber who purchased one of the Accused Devices must subscribe to a Sprint data plan to use the device to connect to the Internet over a wireless network used by Clearwire. In order for an Accused Device to be connected to the wireless system used by

Clearwire, the device must have a SIM card provided by Clearwire that contains information that is associated with a subscriber's account and which enables the Accused Device to be used on the wireless network used by Clearwire. Each Accused Device is enabled or activated by Clearwire through information stored on a SIM card. The SIM card is the key by which Clearwire controls which devices may connect to the wireless network used by Clearwire. Without Clearwire's SIM card, the Accused Device is useless for its intended purpose of facilitating wireless communications over a wireless network. The code, data, and/or other information stored on the SIM card facilitates Clearwire's control over which devices may be connected to the wireless communications network used by Clearwire. The SIM card identifies the subscriber to the network used by Clearwire and facilitates Clearwire in billing the user for the services that the subscriber uses. In addition, in the event the subscriber's service or subscription is terminated, Clearwire may de-activate the device via the use of the code, data, and/or other information stored on the SIM card so that the device cannot connect to the telecommunications network used by Clearwire.

96.     The Clearwire Accused System and the Accused Devices are collectively referred to herein as the "Accused Instrumentalities." The Accused Instrumentalities and the Clearwire Accused Services are collectively referred to herein as the "Accused Instrumentalities and Services."

## Clearwire's Infringing Acts

97.     Clearwire has directly infringed and continues to directly infringe through Sprint one or more claims of the `074 Patent by making, having made, importing, using, offering for sale, and/or selling the Accused Instrumentalities and Services.

98.     For example, but not as a limitation, Clearwire's direct infringement of Claims 1, 3, and 128 of the `074 Patent is shown in each of the claim charts of Exhibits 64-73.

99.     Clearwire uses Sprint's network, which is a redundant microwave communication system.

100.     Each of the Accused Instrumentalities is capable of providing a wireless local area network.

101.     Each of the Accused Instrumentalities is capable of providing a mobile Wi-Fi Hotspot.

102.     Each of the Accused Instrumentalities is capable of acting as a mobile hub station.

103.     Each of the Accused Instrumentalities is capable of transferring information between Sprint's microwave communication system and a wireless LAN using an ethernet packet switching protocol.

104.     Each of the Accused Instrumentalities is capable of transferring information between Sprint's microwave communication system and a wireless LAN using the TCP/IP protocol.

105.     Each of the Accused Instrumentalities is capable of transferring information between Sprint's microwave communication system and a wireless LAN using an Internet protocol.

106.     Therefore, by way of example, but not as a limitation, Clearwire, through Sprint, has and continues to directly infringe Claims 1, 3, and 128 of the `074 Patent.  In addition, Clearwire has and continues to infringe other Claims of the `074 Patent.

107.     Furthermore, Clearwire has engaged in indirect infringement, with knowledge of the Asserted Patent, since at least as early as service of the present suit and continues to

indirectly infringe one or more claims of the `074 Patent by providing its customers with the

infringing Accused Instrumentalities and Services in order to enable those customers to use the

Clearwire Accused System in connection with one or more of the Accused Devices in a manner

covered by one or more of the claims of the Asserted Patent. Clearwire, through Sprint, has and

continues to actively promote tethering and/or local hotspot functionality to its subscribers

knowing that the subscriber's utilization of such tethering or local hotspot functionality on one or

more of the Accused Devices constitutes infringement of one or more claims of the Asserted

Patent. Each subscriber that has tethering or local hotspot capability as part of his or her (or in

the case of an entity, its) Sprint data plan or that pays an extra fee for tethering or local hotspot

service in connection with an Accused Device directly infringes one or more claims of the

Asserted Patent by his or her (or in the case of an entity, its) use of the Accused Instrumentalities

in connection with tethering or local hotspot service.

## FIRST CLAIM FOR RELIEF
### (Infringement of the `074 Patent)

108.    Advanced Media incorporates paragraphs 1 through 107 as though fully set forth

herein.

109.    Upon information and belief, Defendants have been and are now directly and/or

indirectly infringing one or more claims of the `074 Patent by (1) making, importing, using,

offering for sale, and/or selling the patented inventions, (2) by actively inducing others to use the

patented inventions, and/or (3) by contributing to the use of the patented inventions in the United

States.

110.    More particularly, without limitation, Defendants have been and are now directly

infringing one or more claims of the `074 Patent by making, importing, using (including use for

testing purposes), offering for sale, and/or selling their respective Accused Instrumentalities and Services, all in violation of 35 U.S.C. § 271(a).

111. In addition and/or in the alternative, Defendants have been and are now indirectly infringing one or more claims of the `074 Patent by (1) inducing customers to use their respective Accused Instrumentalities and Services to directly infringe one or more claims of the `074 Patent in violation of 35 U.S.C. § 271(b), and/or by (2) contributing to customers' direct infringement of one or more claims of the `074 Patent by their respective use of the Accused Instrumentalities and Services in violation of 35 U.S.C. § 271(c).

112. More particularly, since at least as early as November 6, 2012 in the case of Defendant Sprint and at least as early as service of the present complaint in the case of Defendants Boost Mobile, Virgin Mobile, and Clearwire, Defendants have engaged in indirect infringement in providing their subscribers with infringing Accused Instrumentalities in order to enable those customers to use the Accused Instrumentalities and Services in a way that directly infringes one or more claims of the Asserted Patent. On information and belief, Defendants have intended, and continue to intend, to induce patent infringement by their customers, and have either had knowledge of the `074 Patent and knowledge that the induced acts would constitute infringement or have been willfully blind to the possibility that the induced acts would constitute infringement. Alternatively, on information and belief, Defendants have made, imported, used, sold and/or offered for sale one or more of the Accused Instrumentalities and Services with knowledge of the `074 Patent and the intent that such Accused Instrumentalities and Services be used in connection with an infringing system, with either the knowledge that such system would infringe, or, in the alternative, being willfully blind that such system would infringe.

113.    Advanced Media has been damaged by the infringing activities of Defendants, and will be irreparably harmed unless those infringing activities are preliminarily and permanently enjoined by this Court.  Advanced Media does not have an adequate remedy at law.

114.    With respect to Defendant Sprint, it was given actual notice of the existence of the `074 Patent.  Despite such notice, Sprint has continued in willful acts of infringement without regard to the `074 Patent, and will likely continue to do so unless otherwise enjoined by this Court.

115.    Because of their use of the same telecommunications network (i.e. "Nationwide Sprint Network") and because Defendants Boost Mobile, Virgin Mobile, and Clearwire are wholly owned subsidiaries of Sprint, the Defendants' actions are part of the same transaction, occurrence, or series of transactions or occurrences and there is a logical relationship between the claims asserted against the Defendants such that there is a substantial evidentiary overlap in the facts giving rise to the cause of action against each Defendant.

## REQUEST FOR RELIEF

WHEREFORE, Advanced Media requests the following relief:

(a)    A judgment in favor of Advanced Media that Defendants have directly infringed and/or have indirectly infringed by way of inducement and/or contributory infringement one or more claims of the Asserted Patents;

(b)    A judgment that Advanced Media has been irreparably harmed by the infringing activities of Defendants, and is likely to continue to be irreparably harmed by Defendants' continued infringement;

(c)    Preliminary and permanent injunctions prohibiting Defendants and their officers, agents, servants, employees and those persons in active concert or participation with any of

them, as well as all successors or assignees of the interests or assets related to the Accused

Instrumentalities, from further infringement, direct and indirect, of the Asserted Patents;

(d)     A judgment and order requiring Defendants to pay Advanced Media damages

adequate to compensate for infringement under 35 U.S.C. § 284, which damages may include

lost profits but in no event shall be less than a reasonable royalty for their usage of the inventions

of the Asserted Patents, including pre- and post-judgment interest and costs, including expenses

and disbursements;

(e)     A judgment for treble damages for willful infringement as provided by 35 U.S.C.

§ 284;

(f)     A judgment declaring this an exceptional case and awarding Advanced Media its

attorneys' fees as provided by 35 U.S.C. § 285;

(g)     A judgment awarding Advanced Media its costs as provided under Fed. R. Civ. P.

54(d)(1);

(h)     A judgment for pre- and post-judgment interest on all damages awarded;

(i)     A judgment awarding Advanced Media post-judgment royalties; and

(j)     Any and all such further necessary or proper relief as this Court may deem just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Advanced Media hereby

demands a trial by jury of all issues so triable.

OF COUNSEL:

**BUETHER JOE & CARPENTER, LLC**
Brian A. Carpenter
Eric W. Buether
Christopher M. Joe
Mark D. Perantie
1700 Pacific Avenue
Suite 4750
Dallas, Texas 75201
Telephone:  (214) 446-1273
Facsimile:  (214) 635-1829
*Eric.Buether@BJCIPlaw.com*
*Brian.Carpenter@BJCIPlaw.com*
*Chris.Joe@BJCIPlaw.com*
*Mark.Perantie@BJCIPlaw.com*

Date:  January 9, 2015

**FOX ROTHSCHILD LLP**

*/s/ GREGORY B. WILLIAMS*
Gregory B. Williams (I.D. #4195)
Citizens Bank Center
919 N. Market Street
Suite 300
Wilmington, DE  19899-2323
(302) 622-4211
(302) 656-8920 – Fax
gwilliams@foxrothschild.com

*Attorneys for Plaintiff*
*Advanced Media Networks, LLC*